TERRI F. LOVE, Judge.
hEric Wilson (“Mr. Wilson”) appeals his conviction and sentence for simple robbery. Upon review, we find: (1) the trial court did not abuse its discretion in concluding that the other crimes evidence was admissible based on the testimony of the investigating officers; (2) the State provided adequate notice of its intent to offer other crimes evidence; (3) the probative value of the other crimes evidence was not substantially outweighed by its prejudicial effect; (4) the sentence imposed was not unconstitutionally excessive as it complied with statutory law and jurisprudence; (5) the trial court properly denied Mr. Wilson’s request that theft be included as a responsive verdict to armed robbery because theft requires an essential element that the charged offense does not; and (6) the trial court’s ruling as to the admissibility of the other crimes evidence was not *666 contradictory from its preliminary ruling at the Prieur hearing as the trial court merely limited what other crimes evidence the State was permitted to introduce at trial. Therefore, we affirm Mr. Wilson’s conviction and sentence.

PROCEDURAL HISTORY

Mr. Wilson was charged by bill of information in July 2010 with forcible rape (La. R.S. 14:42.1), second degree kidnapping (La. R.S. 14:44.1), armed Rrobbery (La. R.S. 14:64), and false personation of a peace officer (La. R.S. 14:112). In January 2011, the trial court granted the State’s Prieur[1] motion. Mr. Wilson sought supervisory review; and, in April 2011, this Court denied Mr. Wilson’s writ application.[2] Trial in this matter commenced in June 2011; however, the trial court declared a mistrial on its own motion due to an unforeseen medical emergency preventing the victim from testifying. Thereafter, Mr. Wilson filed a motion to quash based on a claim of double jeopardy. He sought supervisory review with this Court which was granted.[3] The State sought supervisory review with the Louisiana Supreme Court which granted the writ and reversed this Court’s ruling.[4] In June 2012, a jury found Mr. Wilson guilty of simple robbery, a responsive verdict to armed robbery, not guilty as to forcible rape and false personation of a peace officer; and the jury was unable to reach a verdict as to the charge of second degree kidnapping.
After denying Mr. Wilson’s motion for a new trial, the trial court sentenced Mr. Wilson to seven years at hard labor for his conviction of simple robbery. The trial court denied his motion to reconsider sentence. Mr. Wilson’s motion for appeal was granted, and the State nolle prosequied the charge for second degree kidnapping. This appeal followed.

STATEMENT OF FACTS

Mr.'Wilson was convicted of the April 2010 simple robbery of J.T.[5] The State introduced Prieur evidence from events arising out of an aggravated burglary | ¡¡incident in Jefferson Parish from March 2010 that the trial court found admissible in the present matter.

J.T.’s Testimony

J.T., the victim, testified that at the time of the incident she was living in Tampa, Florida. In April 2010, she and her then-boyfriend Charles “Boogey” Fox (“Mr. Fox”) were driving from Tampa to New Mexico to visit her children, when they stopped in New Orleans and checked into the La Quinta Inn. While in New Orleans, Mr. Fox posted a notice on www. sugardaddy.com that J.T. was looking for a companion. She admitted that she had done this twice before in Tampa. She testified her purpose was to meet new people and to get money from older men. At trial, she denied ever having, or ever discussing having, sexual intercourse with the men she met through the website. She did not remember the exact web posting in New Orleans, but stated she knew it mentioned a dinner date and being “new in town.”
*667 J.T. testified that a dinner date was set up with “Eric” for a place in the French Quarter and that they were to meet at her hotel first. J.T. later identified Mr. Wilson in court as “Eric.” Because, Mr. Wilson arrived early and she was still getting ready, she invited him up to her room. She asked to see his identification at the door, and he showed her identification with the name Eric Wilson. He came into the room and sat on the bed. She finished fixing her hair and sat down on the end of the bed to put on her shoes. Describing Mr. Wilson as approximately six feet three to four inches tall, she testified Mr. Wilson stood up above her and began reading her “rights” to her, pretending to be a police officer.
J.T. then asked Mr. Wilson to leave. At trial, J.T. explained to the jury that Mr. Wilson pulled out tape, and she thought he was going to kill or otherwise harm l4her. She stood up and tried to push him out, and he pushed her down onto the bed. She testified that he told her to cooperate or he would hurt her and demanded that she not scream. J.T. testified that Mr. Wilson tied her up with blue tape and began going through her luggage and the drawers. He asked her where she kept her money, and she told him she did not have any money and that he should leave. She testified that once she realized he was not leaving she felt she had to fight him. Aware that she had pepper spray in her purse, she told him to bring her purse to her and she would show him where she kept her money.
J.T. stated that when Mr. Wilson realized she had no money he grew upset and began throwing things around looking for money. He put all of her cell phones and her camera in his pocket. He then pulled her to the edge of the bed, put her knees up to her chest, and began to orally rape her. Knowing Mr. Wilson wanted money, she told him where her Rolex watch was located in the other room. He then put a rag in her mouth and told her to be quiet. J.T. identified in court the rag Mr. Wilson put in her mouth, the tape from her arms and legs, and the pepper spray pouch. J.T. stated that when Mr. Wilson left the room to look for her Rolex watch, she grabbed her pepper spray and met Mr. Wilson in a hallway between the living room and the bedroom. She pepper sprayed him, at which time he “pounced” on her, and they began to struggle.
J.T. stated that he threw her in a closet, pushed a king-sized mattress against the doors, and told her not to open the doors until he left. J.T. testified she did not see him produce a weapon at any point during the struggle. She sustained scratches and cuts to her arms, neck, and chin during the struggle. She testified that she never agreed to participate in any bondage activities or sexual intercourse with Mr. Wilson, nor did she consent to have oral sex with him. Likewise, she did |5not give him permission to take her watch, her cell phones, her camera, or her laptop computer.
At trial, J.T. stated that she did not request medical treatment from the EMS unit called to the hotel because she said it seemed like “more trouble” for her to go through, and she felt like “shutting down.” She was later contacted by the police and asked to identify her property taken by Mr. Wilson.
On cross examination, J.T. denied any suggestion that she engaged in having sex in exchange for money or escorting for money; however, she conceded that men would take her shopping.
Additionally, she denied sending a number of text messages from her cell phone on the date of the incident, including one at noon to “Eric” saying: “Are we on for this afternoon? It is J — .” She also *668 denied texting: “You’re welcome. I’m downtown off Canal and Camp, upscale hotel suite I have for your comfort, 2:30 sounds good.” She denied texting: “Great, are you heading over now and how long did you want to spend with me?” J.T. denied texting the following three messages: “Are you on P41? It is a website to make sure you are not a cop. What do you do for a living? Do you have website or something I can see?”; “Can I verify that when you get here by calling and asking for you, what’s your name in the restaurant?”; and “You can still come see me, but I would need to see a business card and your ID to make sure it matches and we are all good.” J.T. admitted that upon Mr. Wilson’s arrival at the door of her hotel suite, she asked him for his identification and a business card.
J.T. denied texting: “That is perfect. I’m in my room now. How long did you want to see me again?” She replied in the affirmative when asked whether Mr. Fox could have sent the messages. When asked if Mr. Fox would set up dates for 16her on her cell phones, J.T. admitted that “[h]e would handle them while [she] was getting ready or watching a movie or something because [she] didn’t want to be bothered with [her] phones.”
J.T. denied texting: “Danny be here for 12 — at 12:30 for a half-hour.” She did not remember texting Mr. Fox: “Call Mike. He should be here in like five minutes. He’s stuck in traffic.” She did not recall receiving back the following text message from Mr. Fox: “K. Good job, mama. I love it when you are on your sh — .” Nor did she recall texting back to Mr. Fox: “I love you so much and [sic] Mike here for 30.” Nor did she recall Mr. Fox texting back: “K, mama.” Or her texting back: “He is out, 160.”
Further, J.T. did not recall making or receiving a number of other text messages. She maintained that she had never been paid to have sex with men. She said the following text message from Mr. Fox was private stuff between them: “God d— that pu— is good. Now you see why I get upset when Mike takes the whole time. He’s getting sex for 200. He needs to tip.” She denied that the following text message was related to having sex in exchange for money: “Think how frustrated I was fu- some limp di — old guy for an hour.”
J.T. stated on redirect examination that she recalled receiving some vulgar text messages from Mr. Fox, but she said she did not remember exactly what they were about.
Officer Kevin S. Penn, Sr. ⅛ Testimony
New Orleans police officer Kevin S. Penn, Sr. (“Officer Penn”) testified that in April 2010, he responded to a “Signal 42B” (oral rape), at 300 Camp Street in room 212 of the La Quinta Inn. In the living room of the hotel room, he found a female curled up on the sofa. He described her as “pretty emotional,” “upset,” and 17“crying.” He recalled that she had lacerations to the neck and face area, bruises, and recalled seeing some blood. He stated she was a “thin, petite” female of Asian descent, in her twenties. He described the hotel bedroom as having been ransacked and in total disarray, with clothes and personal items thrown around the room. The bed was out of position and the mattress was partially hanging off the box spring.
Officer Penn confirmed that the victim’s boyfriend, Mr. Fox, who appeared upset and emotional, came into the hotel room at some point and spoke with the supervisor on duty. Officer Penn stated on cross examination that a full suitcase was open inside the hotel bedroom. To the best of his recollection, J.T. refused treatment.

*669
Detective Orlynthia Miller-White’s Testimony

NOPD Detective Orlynthia Miller-White (“Detective Miller-White”), a detective with the sex crimes unit, responded to the sexual assault call in April 2010. An officer advised her that he had called for Emergency Medical Services because the victim had sustained lacerations. Once Detective Miller-White stabilized the victim medically, she proceeded with her sexual assault investigation. Detective Miller-White said the room was completely ransacked. The victim had cuts on her face, neck, and arms; and she was hysterical. The victim’s boyfriend was there with her. The detective identified photographs depicting, respectively: (1) blue duct tape on the bed; (2) the bed itself, which had been pushed apart; (3) drawers in the bedroom pulled out and items scattered about the floor; and (4) the front living room area of the hotel suite.
Detective Miller-White also identified items at trial including blue duct tape that was tied around the victim’s arms and her legs during the incident; a white Rface towel that was shoved inside the victim’s mouth when she attempted to call for assistance inside the hotel room; a second piece of tape found inside the hotel room; and a pepper spray pouch.
Detective Miller-White met with the victim’s boyfriend. He provided her with a license plate which she ran, coming up with Mr. Wilson’s name. The detective obtained a photograph of Mr. Wilson, and she confirmed that the description given by the victim matched the photo of Mr. Wilson. Detective Miller-White compiled a photo-lineup and the victim immediately made an identification when presented with the photo-lineup. Detective Miller-White prepared an application and arrest warrant for defendant’s arrest. The detective testified that another officer executed a search warrant in the case.
Detective Miller-White testified on cross examination that she asked the victim where she met Mr. Wilson, and the victim gave her a website where she advertised, www.sugardaddy.com. Detective Miller-White said she tried to retrieve surveillance footage from the hotel to determine whether Mr. Wilson was seen on it, but she was unable to locate any. The detective confirmed that the victim refused medical attention and refused to undergo a sexual assault examination. Detective Miller-White admitted that she never saw a knife, a gun, or any other sharp object or weapon in the hotel room. She admitted that she never searched the victim’s boyfriend, Mr. Fox. The detective admitted that, although she obtained a DNA sample/buccal swab from Mr. Wilson, she did not recall whether she requested that it be tested or compared against any other biological evidence.
At trial, the detective noted that everyone responds to trauma in their own way, and that some victims are calm, some are hysterical, and some are in a state |9of shock. She confirmed that she typically urges victims to see a sexual assault nurse examiner for a sexual assault examination, but that some victims she had dealt with refused such examinations. Detective Miller-White confirmed that blood samples were collected from inside of the hotel room where the incident occurred.
Detective Glenell Sentino ⅛ Testimony
NOPD Detective Glenell Sentino (“Detective Sentino”) confirmed that in May 2010, he participated in the execution of a search warrant at a residence at 3705 Campagna Drive in St. Bernard Parish. Mr. Wilson was not present when the warrant was executed. Evidence seized from the residence, including a laptop, a cell *670 phone, and a Rolex watch, were turned over to Detective Sentino.

Detective Sergeant Paul Miller’s Testimony

St. Bernard Sherriffs Office Detective Sergeant Paul Miller (“Detective Sergeant Miller”) participated in the arrest of Mr. Wilson at 3705 Campagna Drive in St. Bernard Parish. Detective Sergeant Miller obtained a search warrant for the residence and participated in the execution of it. At trial, he identified photographs taken of the residence and of three cellphones, an Acer laptop computer, and a lady’s Rolex watch, all seized during the search of the residence. He also identified photographs of Mr. Wilson’s vehicle, a Dodge Ram pickup truck, which was also searched. Inside the truck was a Canon digital camera matching the description of one stolen from the victim in the instant case. Also recovered in the truck was a partially-used roll of gray duct tape and some black zip ties. Detective Sergeant Miller obtained an arrest warrant for defendant for illegal possession of stolen things.
| WEvents of March 2010

Officer Deputy Brian Martin’s Testimony

Jefferson Parish Sheriffs Office Deputy Brian Martin (“Deputy Martin”) confirmed that in March 2010, he responded to an aggravated burglary call at the Days Inn Hotel in the 3400 block of South 1-10 Service Road. He met two friends of the complainant downstairs, and they escorted him to a room of the hotel where the complainant and an older male were present. The complainant was a petite black female with shoulder length hair. She was crying and appeared to be in shock and a little fearful. She had ligature marks on her wrists and ankles. Deputy Martin said there was blue tape found on the bed and he also observed a sock, and pillowcase.

Sergeant Michael Ocman’s Testimony

Mandeville Police Department Sergeant Michael Ocman (“Sergeant Ocman”) testified that in March 2010, he was a detective with the Jefferson Parish Sheriffs Office and responded to the aggravated burglary complaint at the Days Inn Hotel. He recalled that three items were collected as evidence, including blue tape and a sock found on a bed. He identified a photo of the complainant, who he said was very calm, but disturbed and distraught. He said she had very minor ligature marks on her wrists. He identified a crime scene photograph depicting the ligature marks, as well as other photographs depicting a ligature mark on the complainant’s right ankle. Sergeant Ocman stated that Mr. Wilson was developed as a suspect, and he applied for an arrest warrant on charges of simple robbery, false imprisonment, and false personation of an officer. However, he did not arrest Mr. Wilson.
At trial, Sergeant Ocman was asked to compare Mr. Wilson in the courtroom Into the person for whom he had obtained an arrest warrant in the previous case. He stated that the facial features and distinguishing marks in the hair were very similar. He said Mr. Wilson’s hair looked longer at trial than it did in the photographs, and he said Mr. Wilson looked a lot thinner at trial, especially in the waist area, than he did in the photographs.
Sergeant Ocman confirmed on cross examination that when he arrived at the hotel there were two other civilians present who were associated with the incident. One was a black male who was significantly older than the complainant, and there was also another black female, besides the complainant. He said the complainant provided him with a Florida identification showing she was eighteen years old. The *671 complainant told him that she had an arrangement with the suspect to have sex with her in exchange for two hundred and fifty dollars, for a one-hour period. The complainant admitted that she was in town “working the NCAA tournament.” Sergeant Ocman testified that as part of his investigation he compared video stills from the hotel surveillance camera showing the alleged perpetrator in that incident to known photographs of Mr. Wilson.
Sergeant Ocman also testified that he notified the Jefferson Parish Sheriffs Office vice division, given that it appeared that prostitution was involved, and that the vice division notified the Federal Bureau of Investigation human trafficking division. Subsequently, two FBI special agents came to the scene and interviewed the complainant. No arrest was made and there was no prosecution in the March 2010 matter.

ERRORS PATENT

A review of the record reveals one patent error. Mr. Wilson’s motion for new trial was denied on July 5, 2012. The trial court noted an objection made by 112defense counsel and announced, “All right I’m ready to proceed to sentencing Mr. Wilson.” The trial court then imposed Mr. Wilson’s sentence.
La.C.Cr.P. art. 873 states, in pertinent part, that if a motion for new trial is filed, sentence shall not be imposed until at least twenty-four hours after the motion is denied, unless the defendant expressly waives the delay. “[T]he failure to observe the twenty-four-hour delay mandated by Article 873 is harmless where the defendant does not complain of his sentence on appeal.” State v. Duncan, 11-0563, p. 8 (La.App. 4 Cir. 5/2/12), 91 So.3d 504, 511. In addition, the failure of the trial court to observe the required twenty-four hour delay is harmless where the sentence imposed was mandatory. State v. Seals, 95-0305, p. 17 (La.11/25/96), 684 So.2d 368, 380.
In the instant case, however, Mr. Wilson raises as a pro se assignment of error the argument that his sentence is unconstitutionally excessive. Also, his seven-year sentence, the maximum sentence for the offense of simple robbery, was not mandatory.
A defendant may also implicitly waive the twenty-four-hour delay set by La.C.Cr.P. art. 873. See State v. Santos-Castro, 12-0568, p. 17 (La.App. 4 Cir. 7/31/13), 120 So.3d 933, 943-44 (implicit waiver where defense counsel announced defendant “was ready for sentencing,” but had a motion for new trial, which the trial court denied, whereupon the State announced that it was ready for sentencing, and the trial court imposed sentence); State v. Robichaux, 00-1234, p. 7 (La.App. 4 Cir. 3/14/01), 788 So.2d 458, 464 (implicit waiver where defense counsel stated that “prior to the sentencing” he wished to put on the record an oral motion for a new trial).
In the instant case there were no actions by Mr. Wilson from which it could |iabe concluded that he implicitly waived the sentencing delay.
Nevertheless, this Court has also held that the failure to observe the twenty-four delay provided for by La.C.Cr.P. art. 873 is harmless error “where there is a sufficient delay between the date of conviction and the date of sentencing; there is no indication that the sentence was hurriedly imposed and; there is no argument or showing of actual prejudice by the failure to observe the delay.” State v. Stovall, 07-0343, p. 12 (La.App. 4 Cir. 2/6/08), 977 So.2d 1074, 1082, quoting State v. Foster, 02-0910, pp. 3-4 (La.App. 4 Cir. 12/11/02), 834 So.2d 1188, 1192.
*672 In State v. Sam, 99-0300, p. 1 (La.App. 4 Cir. 4/19/00), 761 So.2d 72, 75, the defendant was convicted on August 9, 1995 and the trial court denied the defendant’s motion for new trial and immediately imposed sentence a month later on September 8, 1995. On error patent review, this Court noted that there was no indication the defendant’s sentence was hurriedly imposed and that the defendant did not argue or in any way show that he was actually prejudiced by the trial court’s failure to observe the delay. Id., 99-0300, pp. 7-8, 761 So.2d at 77-78. Even though the defendant raised excessive sentence as an assignment of error in Sam, this Court found that the failure to observe the delay constituted harmless error. Id.
In the instant case, Mr. Wilson was convicted on June 13, 2012. His sentencing hearing was three weeks later, on July 5, 2012. There is no indication that Mr. Wilson’s sentence was hurriedly imposed. In addition, Mr. Wilson does not argue that he was prejudiced in any way by the trial court’s failure to observe the delay. Accordingly, although in the instant case the trial court erred in failing to observe the twenty-four-hour delay required by La. C.Cr.P. art. 873, the error was harmless.

|,¿ADMISSIBILITY OF PRIEUR EVIDENCE

In his first assignment of error, Mr. Wilson argues that the trial court erred in admitting evidence of the March 2010 incident because the State did not offer sufficient evidence to establish that he committed the prior act.
The Louisiana Supreme Court set forth the applicable law as to the admissibility of evidence of other crimes, wrongs, or acts in State v. Rose, 06-0402, pp. 12-13 (La.2/22/07), 949 So.2d 1236, 1243-44, as follows:
It is well settled that courts may not admit evidence of other crimes to show the defendant as a man of bad character who has acted in conformity with his bad character. La. C.E. art. 404(B)(1); State v. Williams, 96-1023, p. 30 (La.1/21/98), 708 So.2d 703, 725; State v. Prieur, 277 So.2d 126, 128 (La.1973). Evidence of other crimes, wrongs or acts committed by the defendant is generally inadmissible because of the “substantial risk of grave prejudice to the defendant.” Prieur, 277 So.2d at 128. However, the State may introduce evidence of other crimes, wrongs or acts if it establishes an independent and relevant reason such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. La. C.E. art. 404(B)(1). The State must provide the defendant with notice and a hearing before trial if it intends to offer such evidence. Prieur, 277 So.2d at 130. Even when the other crimes evidence is offered for a purpose allowed under art. 404(B)(1), the evidence is not admissible unless it tends to prove a material fact at issue or to rebut a defendant’s defense. State v. Martin, 377 So.2d 259, 263 (La.1979); Prieur, 277 So.2d at 130. The State also bears the burden of proving that defendant committed the other crimes, wrongs or acts. State v. Galliano, 2002-2849, p. 2, (La.1/10/03), 839 So.2d 932, 933 (per curiam).
Although a defendant’s prior bad acts may be relevant and otherwise admissible under La. C.E. art. 404(B), the court must still balance the probative value of the evidence against its prejudicial effects before the evidence can be admitted. La. C.E. art. 403. Any inculpatory evidence is “prejudicial” to a defendant, especially when it is “probative” to a high degree. State v. Germain, 433 So.2d 110, 118 (La.1983). As used in the *673 balancing test, “prejudicial” limits the introduction of probative evidence of pri- or misconduct only when it is unduly and unfairly prejudicial. Id. See also Old Chief v. United States, 519 U.S. 172, 180, 117 S.Ct. 644, 650, 136 L.Ed.2d 574 (1997)(“The term ‘unfair prejudice,’ as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof | ^specific to the offense charged.”). (Footnote omitted).
A trial court’s ruling on the admissibility under La. C.E. art. 404(B)(1) of other crimes evidence is renewable under an abuse of discretion standard. See State v. Henderson, 12-2422, p. 3-4 (La.1/4/13), 107 So.3d 566, 568; State v. Barnes, 11-1421, p. 15 (La.App. 4 Cir. 9/19/12), 100 So.3d 926, 936, writ denied, 12-2251 (La.4/1/13), 110 So.3d 575. “A trial court’s ruling as to the relevancy of evidence will not be disturbed absent a clear abuse of discretion.” State v. Sanders, 12-0409, p. 14 (La.App. 4 Cir. 11/14/12), 104 So.3d 619, 630. “A trial court is vested with much discretion in determining whether the probative value of relevant evidence is substantially outweighed by its prejudicial effect.” State v. Girard, 12-0790, p. 6 (La.App. 4 Cir. 3/6/13), 110 So.3d 687, 691.
Mr. Wilson contends that the State had to prove by clear and convincing evidence, as opposed to a preponderance of the evidence standard, that he committed the pri- or offenses before such evidence could be presented to the jury. However, the burden of proof issue in other crimes eases is problematic, in that there is no definitive decision by the Louisiana Supreme Court as to the applicable burden to prove prior crimes otherwise admissible under La. C.E. art. 404(B).
La. C.E. art. 1104, states:
The burden of proof in a pretrial hearing held in accordance with State v. Prieur, 277 So.2d 126 (La.1973), shall be identical to the burden of proof required by Federal Rules of Evidence Article IV, Rule 404.
In Huddleston v. U.S., 485 U.S. 681, 685, 108 S.Ct. 1496, 1499, 99 L.Ed.2d 771 (1988), the U.S. Supreme Court purported to “resolve a conflict among the Courts of Appeals as to whether the trial court must make a preliminary finding before ‘similar act’ and other [Fed.] Rule [of Evid.] 404(b) evidence is submitted to the jury.” | wfIuddleston involved a prosecution for selling video cassette tapes stolen in interstate commerce and possessing that stolen property in interstate commerce. The primary issue at trial was whether the defendant knew the goods were stolen. The government sought to introduce evidence that defendant had sold stolen televisions on one occasion several months before committing the crimes for which he was being tried.
The Court in Huddleston concluded that “a preliminary finding by the court that the Government has proved the act by a preponderance of the evidence”' was not called for, holding instead that “[t]he court simply examines all the evidence in the case and decides whether the jury could reasonably find the conditional fact — here, that the televisions were stolen — by a preponderance of the evidence.” Id., 485 U.S. at 689-90, 108 S.Ct. at 1501.
In reaching its finding, the Court in Huddleston rejected the defendant’s argument that “the evidence should not have been admitted because the Government failed to prove to the District Court [by a preponderance of the evidence] that the televisions were in fact stolen.” Id., 485 U.S. at 686, 108 S.Ct. at 1499. The Court found that defendant’s reading of F.R.E. 404(b) as mandating a preliminary finding *674 that the act in question occurred “not only superimposes a level of judicial oversight that is nowhere apparent from the language of that provision, but it is simply inconsistent with the legislative history behind Rule 404(b).” Id., 485 U.S. at 688, 108 S.Ct. at 1500.
Louisiana jurisprudence discussing the issue as to the admissibility of evidence of other crimes, wrongs, or acts pursuant to La. C.E. art 404(B) is generally couched in terms of whether the State has to prove the prior crimes, wrongs, or acts by a preponderance of the evidence or by clear and convincing 117evidence. The Louisiana Supreme Court’s latest pronouncement on the issue was in Rose, supra, where the court quotes La. C.E. art. 1104, and states that it has not yet addressed the extent to which La. C.E. art. 1104 and the burden of proof required by the federal rules, as interpreted in Huddleston, has affected the burden of proof required for the admissibility of other crimes evidence in Louisiana. Instead, the court in Rose concluded that it did not need to reach that issue because it found that the State satisfied its burden under either the clear and convincing standard or the preponderance of the evidence standard.
This Court reached that same result in several decisions. See Barnes, 11-1421, p. 16, 100 So.3d at 937 (the State proved that the defendant committed the prior shooting under either the preponderance of evidence or clear and convincing standard); State v. Scoggins, 10-0869, pp. 11-15 (La.App. 4 Cir. 6/17/11), 70 So.3d 145, 153-55 (the State sufficiently demonstrated the probative nature of the evidence of the other crime by either applicable standard — although this Court recognized at one point that, considering La. C.E. art. 1104, “it is not unreasonable to conclude that the State’s burden of proof for introducing other crimes evidence at trial is by a preponderance of the evidence.”).
Following the Prieur hearing, the trial court found that under either standard, the State proved that Mr. Wilson was involved in the prior incident.[6] Deputy Martin confirmed that in March 2010, he responded to a home invasion call at the Day’s Inn on I — 10 Service Road. The victim informed him that a subject forced her into her room, bound and tied her, put a sock in her mouth and a | ^pillowcase over her head, and took some of her belongings including a laptop computer. Deputy Martin testified that he personally saw blue tape on the bed in the victim’s hotel room, a sock next to the tape, and a pillowcase on the floor. Deputy Martin also testified that he called the telephone number the perpetrator had given the victim, and a voice mail message said “Eric Wilson.”
Detective Ocman testified similarly to Deputy Martin, who acknowledged that the blue tape and a sock were collected as evidence from a bed in the victim’s hotel room. In addition, Deputy Ocman testified that in his investigation of the March 2010 incident he compared known photographs of Eric Wilson with video surveillance stills and determined that it was the same person. At trial, Detective Ocman was asked how Mr. Wilson in the courtroom compared to his recollection of the “Eric Wilson” from the March 2010 incident. Detective Ocman stated that Mr. Wilson’s “facial features and distinguishing marks in the hair were very similar;” in addition, he noticed that Mr. Wilson’s hair was longer, he had facial hair, and he *675 looked thinner. He also identified an application for an arrest warrant he prepared for the arrest of an “Eric Wilson” for the March 2010 Jefferson Parish crimes of simple robbery, false imprisonment, and false personation of an officer, along with an arrest warrant for “Eric Wilson” signed by a magistrate judge.
Having heard testimony and argument relative to the March 2010 incident, the trial court admitted the evidence under La. C.E. art. 404(B)(1) to show intent, preparation, plan, knowledge, identity, and motive. Based on the foregoing and the vast discretion given to the trial court to determine the admissibility and relevancy of Prieur evidence, we cannot say that the trial court abused its discretion in admitting evidence of the March 2010 incident.
Nevertheless, even if the trial court erred by admitting the Prieur evidence, |19the error is harmless. State v. Garcia, 09-1578, p. 55 (La.11/16/12), 108 So.3d 1, 39, cert. denied, Garcia v. Louisiana, — U.S. —, 133 S.Ct. 2863, 186 L.Ed.2d 926 (2013). An error is harmless if it can be said beyond a reasonable doubt that the guilty verdict rendered in the case was surely unattributable to that error. State v. Robertson, 06-1537, p. 9 (La.1/16/08), 988 So.2d 166, 172.
Here, the jury found Mr. Wilson guilty of simple robbery. The victim, J.T., testified that Mr. Wilson stole from her hotel room her cellphones, laptop computer, camera, and Rolex watch. Further, she identified Mr. Wilson as the perpetrator in a photographic lineup as well as at trial. The investigating officers testified that upon executing a search warrant of Mr. Wilson’s residence, they collected into evidence the property that J.T. reported stolen. Given the evidence presented at trial, it can be said beyond a reasonable doubt that the verdict of guilty of simple robbery rendered in the instant case was surely unattributable to any error the trial court may have committed in concluding that the State had proven — under either standard — that Mr. Wilson committed the 2010 offenses and thus that such evidence was admissible. We find no merit to this assignment of error.

NOTICE OF PRIEUR EVIDENCE

In his second assignment of error, Mr. Wilson argues that the State’s Prieur. notice was vague because it did not specify why the prior acts were admissible.[7] In its 1973 pre-Louisiana Code of Evidence decision in Prieur, the Louisiana Supreme Court set forth the requirements for the admission of “evidence of other criminal offenses under the exceptions outlined in [now repealed] R.S. 15:445 and 446.” Pri-eur, 277 So.2d at 130. One of those requirements was that in its written statement of notification the State “specify the exception to the general ^exclusionary rule upon which it relies for the admissibility of the evidence of other acts or offenses.” Id.
Present La. C.E. art. 404(B)(1) states that “upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such [other crimes] evidence it intends to introduce at trial for such purposes ...”
Although La. R.S. 15:445 and 15:446 were repealed effective January 1,1989, to coincide with the adoption of the Louisiana Code of Evidence, there is no indication that PrieuVs requirement that the State specify which of the listed purposes set forth in La. C.E. art. 404(B)(1) regarding the other crimes evidence is no longer required.
*676 Mr. Wilson is correct that in its notice of intent to offer Prieur evidence, the State merely listed all the possible purposes set forth in La. C.E. art. 404(B)(1): “motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident.”
Even assuming that the State’s Prieur notice was inadequate for lack of specificity as to which purpose(s) it was seeking to introduce the other crimes evidence, the erroneous admission of other crimes evidence due to the State’s failure to give the defense proper notice is subject to the harmless error rule. Robertson, supra, citing State v. Johnson, 94-1379, p. 17 (La.11/27/95), 664 So.2d 94, 102.
Mr. Wilson fails to show how he was prejudiced by any lack of specificity in the State’s Prieur notice as to what purpose(s) the State was seeking to introduce the other crimes evidence. The verdict of guilty of simple robbery was surely unattributable to any error by the State insofar as the adequacy of its Prieur notice, |21or by the trial court in admitting the other crimes evidence despite any such defect in the State’s Prieur notice. We find no merit to this assignment of error.

PROBATIVE VALUE OF PRIEUR EVIDENCE

In Mr. Wilson’s last counseled assignment of error, he argues that the trial court erred in admitting the other crimes evidence because the probative value of the prior, uncharged crimes was substantially outweighed by its prejudicial effect.
La. C.E. art. 403 states, “[although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time.” Unfair prejudice, as used in La. C.E. art. 403, means that “the offered evidence has ‘an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.’ ” Sanders, 12-0409, p. 13-14 (La.App. 4 Cir. 11/14/12), 104 So.3d at 630, quoting Author’s Note (3) to La. C.E. art. 403, Handbook on Louisiana Evidence Law, Pugh, Force, Rault & Triche (2009). The erroneous introduction of evidence relating to a defendant’s prior bad acts risks “ ‘lur[ing] the fact-finder into declaring guilt on a ground different from proof specific to the offense charged ... [by] generalizing a defendant’s earlier bad act into bad character and taking that as raising the odds that he did the later bad act now charged....’” State v. Ruiz, 06-1755, p. 7 (La.4/11/07), 955 So.2d 81, 86, quoting State v. Womack-Grey, 00-1507, p. 1 (La.12/7/01), 805 So.2d 1116, 1116.
The two incidents at issue occurred only three weeks apart. Each involved several alleged crimes. The two incidents are similar in that the perpetrator made a prostitution date with the victim, went to her hotel room for the engagement, impersonated a police officer once inside the room, bound the victim using blue 122tape, gagged the victim, searched her belongings, and stole a laptop computer. In the instant matter, the perpetrator stole more items from his victim than did the perpetrator in the first case, allegedly sexually assaulted his victim, and allegedly cut her with a sharp instrument. However, the victim in this ease admitted that “most” of her injuries were inflicted after she confronted and sprayed the perpetrator with pepper spray. In the March 2010 incident there is no indication the victim, whose injuries were slight ligature marks on her wrists and ankles, resisted the perpetrator. Based on the similarities of the two incidents and the proximity in time in which they occurred, the trial court concluded the March 2010 incident was relevant to *677 establish Mr. Wilson’s intent, identity, plan, and preparation.
“A trial court is vested with much discretion in determining whether the probative value of relevant evidence is substantially outweighed by its prejudicial effect.” State v. Thomas, 11-1219, pp. 21-22 (La.App. 4 Cir. 12/6/12), 106 So.3d 665, 679. Further, a trial court’s ruling admitting the evidence carries with it an implicit conclusion that the trial court found that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, as per La. C.E. art. 403. See State v. Magee, 11-0574, p. 49, n. 37 (La.9/28/12), 103 So.3d 285, 320 (“Although the district court did not specifically rule on the admissibility of the statements under La. C.E. art. 403 (perhaps because it was not asked to), the court admitted the statements, implicitly finding that their probative value substantially outweighed the danger of ‘unfair prejudice, confusion of the issues, or misleading the jury.’ La. C.E. art. 403.”).
We find the trial court did not abuse its discretion in implicitly finding that l^the probative value of the evidence of the March 2010 incident was not substantially outweighed by its prejudicial effect. We find no merit to this assignment of error.

UNCONSTITUTIONALLY EXCESSIVE SENTENCE

In his first pro se assignment of error, Mr. Wilson argues that the maximum seven-year sentence of imprisonment for simple robbery imposed pursuant to La. R.S. 14:65 is unconstitutionally excessive. Following sentencing, defense counsel filed an oral motion for reconsideration of sentence, claiming that the sentence was unconstitutionally excessive. The trial court denied the motion.
La. Const, art. I, § 20 explicitly prohibits excessive sentences. Although a sentence is within the statutory limits, the sentence may still violate a defendant’s constitutional right against excessive punishment. State v. Every, 09-0721, p. 7 (La.App. 4 Cir. 3/24/10), 35 So.3d 410, 417, quoting State v. Smith, 01-2574, p. 7 (La.1/14/03), 839 So.2d 1, 4. “However, the penalties provided by the legislature reflect the degree to which the criminal conduct is an affront to society.” State v. Cassimere, 09-1075, p. 5 (La.App. 4 Cir. 3/17/10), 34 So.3d 954, 958. “A sentence is unconstitutionally excessive if it makes no measurable contribution to acceptable goals of punishment, is nothing more than the purposeless imposition of pain and suffering, and is grossly out of proportion to the severity of the crime.” State v. Ambeau, 08-1191, p. 9 (La.App. 4 Cir. 2/11/09), 6 So.3d 215, 221. “A sentence is grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it shocks the sense of justice.” Id., 08-1191, p. 9, 6 So.3d at 221-22.
In reviewing an excessive sentence claim, an appellate court generally “ ‘must determine whether the trial judge has adequately complied with the ^statutory guidelines in La.C.Cr.P. art. 894.1’ ” and whether the sentence is warranted under the facts established by the record. State v. Wiltz, 08-1441, p. 10 (La.App. 4 Cir. 12/16/09) 28 So.3d 554, 561, quoting State v. Batiste, 06-0875, p. 18 (La.App. 4 Cir. 12/20/06), 947 So.2d 810, 820. If adequate compliance with La. C.Cr.P. art. 894.1 is found, “the reviewing court must determine “whether the sentence imposed is too severe in light of the particular defendant and the circumstances of the case, keeping in mind that maximum sentences should be reserved for the most egregious violators of the offense *678 so charged.’ ” State v. Bell, 09-0588, p. 4 (La.App. 4 Cir. 10/14/09), 23 So.3d 981, 984, quoting State v. Ross, 98-0283, p. 8 (La.App. 4 Cir. 9/8/99), 743 So.2d 757, 762.
However, even where there has not been full compliance with La. C.Cr.P. art. 894.1, resentencing is unnecessary where the record shows an adequate factual basis for the sentence imposed. State v. Stukes, 08-1217, p. 25 (La.App. 4 Cir. 9/9/09), 19 So.3d 1233, 1250. Further, La.C.Cr.P. art. 881.4(D) expressly states that an “appellate court shall not set aside a sentence for excessiveness if the record supports the sentence imposed.”
Mr. Wilson was fifty-one years old at the time of sentencing. No prior convictions were mentioned at his sentencing. Prior to sentencing, Mr. Wilson sent the trial judge a letter stating that “after this nightmare I will never again call an escort or pay a woman for sex, because it’s [sic] & it ruined my life.” He maintained his innocence, yet at the same time admitted that he “knew it was wrong for me to take [the victim’s] things, no matter the reason.” In the letter, Mr. Wilson referred to himself as a first-time offender. He also said he had “never before struck, assaulted, robbed or cut another human being.”
The trial court noted that in the letter Mr. Wilson admitted his guilt for | ¾ simple robbery. The trial judge also stated that she found the majority of Mr. Wilson’s letter disingenuous. She found the letter, in which Mr. Wilson purported to berate and condemn himself for seeking an escort for sex, was tailored to her because she was a female.
The trial court stated that Mr. Wilson had received a “tremendous break” when he was convicted only of simple robbery. He was charged with and was tried for armed robbery on that particular count, as well as forcible rape, second degree kidnapping, and false personation of an officer. In State v. Fernandez, 09-1727 (La.App. 4 Cir. 10/6/10), 50 So.3d 219, this Court found a maximum seven-year sentence for simple robbery was not unconstitutionally excessive. The defendant was charged with armed robbery, but convicted of the lesser offense of simple robbery. This Court found that the female defendant was the lynchpin in the scheme to rob her childhood friend and the friend’s fian-cé, although she had not brandished a gun during the robbery.
In the instant case, Mr. Wilson was accused of binding the victim; terrorizing her looking for money and valuables; sexually assaulting her; violently fighting with her when she attempted to resist the robbery, leaving her bloodied; and stealing three cell phones, a camera, a laptop computer, and a Rolex watch from her. Considering the allegations Mr. Wilson faced, he greatly benefitted from the jury finding him guilty of the lesser responsive verdict of simple robbery.
Accordingly, it cannot be said that the maximum sentence of seven years at hard labor makes no measurable contribution to acceptable goals of punishment, is nothing more than the purposeless imposition of pain and suffering, or is grossly out of proportion to the severity of the crime. Likewise, it cannot be said that when the crime and punishment are considered in light of the harm done to society, 120it shocks the sense of justice. We find no merit to this assignment of error.

JURY CHARGE

In his second pro se assignment of error, Mr. Wilson argues that the trial court erred in denying his request to include responsive verdicts of “felony and misdemeanor theft” in the list of responsive verdicts. This argument relates to defense counsel’s written request for a spe *679 cial charge to include theft “as a lesser included offense to the crime of Armed Robbery.”
Pursuant to La.C.Cr.P. art. 803, “[w]hen a count in an indictment sets out an offense which includes other offenses of which the accused could be found guilty under the provisions of Article 814 or 815, the court shall charge the jury as to the law applicable to each offense.”
La.C.Cr.P. art. 814(A) states, in pertinent part, that:
The only responsive verdicts which may be rendered when the indictment charges the following offenses are:
[[Image here]]
22. Armed robbery:
Guilty.
Guilty of attempted armed robbery.
Guilty of first degree robbery.
Guilty of attempted first degree robbery.
Guilty of simple robbery.
Guilty of attempted simple robbery.
Not guilty. (Emphasis added).
Under La.C.Cr.P. art. 814(A)(22), the “only” responsive verdicts which may be rendered when the indictment charges armed robbery are the offenses listed, which do not include the offense of theft. However, La.C.Cr.P. art. 802(1) states that the court shall charge the jury “[a]s to the law applicable to the case.” We have previously interpreted this rule “as requiring the trial court to charge the jury, when properly requested, as to the law applicable to any theory of defense |87which the jury could reasonably infer from the evidence.” State v. Brown, 12-0626, p. 19 (La.App. 4 Cir. 4/10/13), 115 So.3d 564, 576-77. This rule is supported by La. C.Cr.P. art. 807, which states, in pertinent part:
A requested special charge shall be given by the court if it does not require qualification, limitation, or explanation, and if it is wholly correct and pertinent. It need not be given if it is included in the general charge or in another special charge to be given. (Emphasis added).
Thus, under La.C.Cr.P. art. 802, even if the requested charge is for a responsive verdict to an offense for which responsive verdicts are provided for in La. C.Cr.P. art. 814(A), and the requested responsive verdict is not listed, the trial court must charge the jury, provided it is fairly supported by the evidence and thus pertinent — and does not require qualification, limitation, or explanation, and it is wholly correct. See State v. Jackson, 450 So.2d 621, 632-33 (1984) (in prosecution for first degree murder, “the offense of negligent homicide was not fairly supported by the evidence; and thus the special instruction was not pertinent and need not have been given”); State v. Lane, 414 So.2d 1223, 1228 (La.1982).
Mr. Wilson’s written motion for a special jury instruction requests that theft be included as a responsive verdict to the charge of armed robbery because theft is a lesser included offense of armed robbery. Theft, however, is not a lesser included offense.
La. R.S. 14:64 defines armed robbery as:
[T]he taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon.[8]
*680 La. R.S. 14:67 defines theft as:
12s[T]he misappropriation or taking of anything of value which belongs to another, either without the consent of the other to the misappropriation or taking, or by means of fraudulent conduct, practices, or representations. An intent to deprive the other permanently of whatever may he the subject of the misappropriation or taking is essential. (Emphasis added).
It is well-settled that “a lesser and included offense is one in which all of its essential elements are also essential elements of the greater charge, such that evidence sufficient to support a conviction of the charged offense necessarily supports conviction on the lesser offense.” State v. Manning, 03-1982, p. 65 (La.10/19/04), 885 So.2d 1044, 1101; State v. Maxwell, 11-0564, p. 28 (La.App. 4 Cir. 12/21/11), 83 So.3d 113, 130, writ denied, 12-0226 (La.9/21/12), 98 So.3d 323. As noted by the Louisiana Supreme Court in State v. Simmons, 01-0293, p. 4 (La.5/14/02), 817 So.2d 16, 19, “[s]tated another way, ‘if any reasonable state of facts can be imagined wherein the greater offense is committed without the perpetration of the lesser offense, a verdict for the lesser offense cannot be responsive [citations omitted].’ ”
Because theft requires an essential element that armed robbery does not — an intent to deprive the other permanently of the subject of the taking — it follows that evidence sufficient to support a conviction of armed robbery does not necessarily support a conviction of theft. One can commit an armed robbery without having the specific intent to deprive the other permanently of the thing taken.
Further, theft is graded according to the value of the thing taken or misappropriated. The value of the property stolen must be stated in an indictment for theft. See La.C.Cr.P. art. 465(44). Value is an essential element of the offense of theft. See State v. Hudgins, 400 So.2d 889, 893 n. 3 (La.1981) (“It is necessary for the State to establish the value of the property subject to a theft as La. R.S. 14:67 establishes severity of penalties according to the value of the property liaStolen.”).
Conversely, “[pjroof of value is not a necessary element of robbery, as the offender’s use of force or intimidation against the victim to accomplish the taking is the aspect of the crime that the legislature intends to punish.” State v. Goodley, 01-0077, pp. 8-9 (La.6/21/02), 820 So.2d 478, 483 (contrasting robbery and theft). “ ‘The purpose of the force or intimidation element of robbery is to distinguish, by imposition of a more severe penalty, those takings which pose a greater risk to the victim.’ ” Id., 01-0007, p. 9, 820 So.2d at 484, quoting State v. Meyers, 620 So.2d 1160, 1163 (La.1993).
At trial, there was no evidence presented as to the value of any of the things taken from the victim. There was no evidence that anything was taken from the victim, or from her hotel room, except by the use of force or intimidation. It is the use of force or intimidation that differentiates robbery from theft.
The trial judge, as to Mr. Wilson’s motion to give a special charge regarding theft, did not allow it as a responsive verdict for armed robbery. We find the trial court did not err in concluding theft was not a responsive verdict. Thus, there is no merit to this assignment of error.

LIMITED ADMISSIBILITY OF PRIEUR EVIDENCE

Mr. Wilson entitles his last pro se assignment of error as: “The Trial Court Admitted Error on Record. Her rulings *681 seemingly reflect contradiction.” This assignment is directed to the Prieur evidence the trial court found admissible.
At the Prieur hearing, the trial court stated that it found the State proved the March 2010 prior crimes and that Mr. Wilson was the perpetrator, under either the preponderance of the evidence standard or the clear and convincing evidence standard. At trial, however, comments by the court indicate that it only | .^preliminarily ruled that the State sufficiently proved that it could meet the standard of admissibility at trial, which is consistent with the U.S. Supreme Court’s decision in Huddleston, supra, on the admissibility of other crimes evidence under F.R.E. art. 404(b), which was made applicable to admission of other crimes evidence under La. C.E. art. 404(B)(1) by La. C.E. art. 1104.
In the instant assignment of error, Mr. Wilson characterizes the trial court’s rulings on the admissibility of Prieur evidence as contradictory. The issue came before the court at trial after the first witness testified, and a bench conference was held out of the presence of the jury. The trial court stated that because the State would be unable to establish a foundation for introducing certain evidence from the March 2010 incident, the Prieur evidence was admissible but for limited purposes. The trial court informed the State that certain evidence was inadmissible to establish that Mr. Wilson committed the March 2010 offenses. Specifically, the State could not present the subpoena duces tecum or testimony relating to the telephone records of the number the perpetrator gave the victim. Additionally, the State could not elicit testimony from Deputy Martin that when he called the telephone number the perpetrator gave the victim, a voice mail message said: Eric Wilson. The trial court, however, allowed the State to introduce into evidence testimony regarding Detective Ocman’s comparing of photographs of Eric Wilson to surveillance video, the 911 call, and pictures of the victim. This ruling benefitted defendant, as did another ruling that the State could not present any testimony concerning a subpoena duces tecum for the telephone records of the telephone number the perpetrator gave the victim.
Defense counsel moved for a mistrial during this bench conference, arguing that when the State refers in its opening statement to inadmissible other crimes | S1 evidence, there has to be a mistrial. The trial court denied the motion for a mistrial. On appeal, Mr. Wilson fails to point to any inadmissible other crimes evidence referred to by the State in its opening statement and does not argue that the trial court erred in denying the motion for mistrial.
As discussed previously, any error by the trial court in admitting evidence of the March 2010 incident was harmless and Mr. Wilson fails to show any prejudicial error in the instant assignment of error. Therefore, we find no merit to this assignment of error.

DECREE

For the foregoing reasons, we affirm Mr. Wilson’s conviction and sentence.
AFFIRMED.

. State v. Prieur, 277 So.2d 126 (La.1973).

. State v. Wilson, unpub., 11-0186 (La.App. 4 Cir. 4/7/11), writ denied, 11-0899 (La.5/20/11), 63 So.3d 987.

. State v. Wilson, unpub., 11-1056 (La.App. 4 Cir. 11/15/11).

. State v. Wilson, 11-2532 (La.12/16/11), 76 So.3d 1187.

. To prevent public disclosure of the victim's name, the victim is herein referred to by her initials pursuant to La. R.S. 46:1844(W).

. As addressed in Mr. Wilson's pro se assignment of error, the trial court preliminarily ruled at the Prieur hearing that the other crimes evidence was admissible without conditions; however, at trial, the trial court limited the admissibility of the other crimes evidence to certain testimony and evidence.

. Mr. Wilson also raised this issue at the Prieur hearing.

. Prior to amendment by Acts 1983, No. 70, § 1, La. R.S. 14:64 defined armed robbery, in pertinent part, as "the theft of anything of value....” (Emphasis added). The 1983 amendment substituted "taking" in place of "theft," and inserted "belonging to another.”